IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER DALTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  3:10cv843-MEF |
| | ) | (WO) |
| CHAD STANCIL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

Christopher Dalton ("Dalton" or "Plaintiff") shot a Reserve Deputy Sheriff.  While handcuffed, Dalton pulled a handgun from his pocket and fired numerous times at law enforcement officers.  One officer returned fire.  Against this factual backdrop, Dalton brings this 42 U.S.C. § 1983 action against the Deputy who shot and wounded him and the Reserve Deputy Sheriff, claiming they violated his rights under the Fourth and Eighth Amendments because they used excessive force against him and subjected him to an unlawful arrest.  Lee County Deputy Sheriff Chad Stancil ("Deputy Stancil") and Reserve Deputy Sheriff Leon Aaron ("Deputy Aaron") contend that they are entitled to qualified immunity, a contention with which the court agrees.

Previously, the court ordered the defendants to file an Answer and Special Report, and they have done so.  The court notified Plaintiff that the Special Report could at any time be considered as a Motion for Summary Judgment.  The court also informed Plaintiff about the

proper manner in which to respond to a motion for summary judgment, and set a deadline for Plaintiff's Response.  Plaintiff has responded, and the court concludes that the Motion for Summary Judgment is properly before the court for consideration.  Upon consideration of the Motion, the court concludes that it is due to be GRANTED and this case dismissed with prejudice.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute][1] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); FED.R.CIV.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to

---

[1]  Effective December 1, 2010, the language of Rule 56(a) was amended.  The word "dispute" replaced the word "issue" to "better reflect[] the focus of a summary-judgment determination." FED.R.CIV.P. 56(a), Advisory Committee Notes, 2010 Amendments.

present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; FED.R.CIV.P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must be support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id*. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there

must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) *quoting Anderson*, *supra.* Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than

4

simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).  However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine issue of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

### III.  DISCUSSION

### A. Facts

The first step in assessing the constitutionality of the defendants' actions is to determine the relevant facts. This court is required to review the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The added wrinkle in this case, however, is the existence of a video capturing the events in question. At times, the video quite clearly contradicts Dalton's version of the story. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Therefore, where the video blatantly contradicts Dalton's allegations, the court will view the facts in the light depicted by the video recording.

On August 25, 2008, Dalton borrowed a friend's pistol, intending to use the gun for "amusement purposes only." (Doc. No. 73, Pl's Response pp. 4-5). The following evening, Dalton left work and drove to his girlfriend's house. (*Id.*, p. 4). Along the way, Dalton rolled down his car window and shot the pistol twice toward the sky. (*Id*). Upon arriving at his girlfriend's house, Dalton called his friend Cody Dudley ("Dudley") and they decided to meet and "possibly go around stealing out of vehicles to get cash for gas money." (*Id.*, p. 5). At some point, Dalton and his girlfriend, Jessica Wells, met Dudley at the home of another friend, Joseph Pffanschmidt ("Pffanschmidt"). (*Id.*)

While patrolling the Lee County area in their marked patrol car around 9:00 p.m,

6

Deputy Stancil and Deputy Aaron received a call to be on the lookout for several juveniles dressed in black and driving a four-door vehicle who were breaking into vehicles and houses in the Smith Station area.  (Attach. to Doc. No. 24, Aaron's Affid., pp. 1-2).

Around 1:30 a.m., Dalton drove his friends around the Smith Station area.  (Doc. No. 73, Pl's Resp., p. 5).  Dalton parked his car along the side of Lee Road and covered his license plate with a plastic bag.  (*Id*., p. 6).  Dudley's girlfriend remained in the car while Dalton, Dudley, and Pffanschmidt looked around the neighborhood.  (*Id*).  After a few minutes, they returned to the car and Dalton began driving them along Lee Road.  (*Id*).  Upon learning that one of his friends had retrieved pornographic magazines, Dalton pulled over the car and began looking through the magazines and the other items taken by Dudley and Pffanschmidt, including a digital camera in a black carrying case.  (*Id*., pp. 6-7).

While traveling east on Lee Road, Deputy Stancil saw a four-door vehicle parked with its lights off at the entrance to the Rosewood subdivision in Smith Station.  (Doc. No. 24, Stancil's Affid., p. 2).  Deputy Stancil parked his patrol car next to the vehicle.  (*Id*.)  Both Deputy Stancil and Deputy Aaron got out of their car and approached the vehicle. (*Id*.) Dalton dropped the camera on the floorboard. (Doc. No. 73, Pl's Response, p. 7).  One of the deputies asked him, "What you droppin' beside your leg?"  (*Id*).  Dalton told him it was a camera and began to pick it up.  (*Id*., p. 8; DVD containing video from Stancil's patrol car camera).  Deputy Stancil pointed a gun at Dalton and ordered him to "quit reaching under the seat," to put his car in park, and to get out of the vehicle. (Doc. No. 73, p. 8).  The deputy hit Dalton's chest and pulled Dalton out of the car by his jacket.  (*Id*.).  After exiting his car,

7

Deputy Stancil shoved Dalton against his vehicle and ordered him to put his hands behind his back and to "[q]uit moving your hands before I break them." (*Id*.)   While being handcuffed, Dalton's arms were "aggressively shaken" by the deputy. (*Id*., p. 9). The deputy asked Dalton his name and he responded, "Chris." (*Id*.) The deputy pushed Dalton over his vehicle and advised, "Chris if you move, I am gonna break your legs! Do you understand me?!" (*Id*.) Dalton accidentally moved. (*Id*). The deputy said, "I told you not to move, Stupid." (*Id*.) Dalton said, "I can't breathe." (DVD containing video from Stancil's patrol car camera). Deputy Stancil asked him why he could not breathe and Dalton responded, "Because I'm laying on my chest." (*Id*.) Deputy Stancil handcuffed Dalton and placed him in front of his patrol car. (Doc. No. 73, p. 8; Def's Ex. 4, DVD containing video from Stancil's patrol car camera). Deputy Stancil commented, "Ya'll been stealing ----, you got your tag covered up." (Def's Ex. 4, DVD).

While Deputy Aaron watched Dalton, Deputy Stancil removed the male passengers from the vehicle, handcuffed them, and took them to the front of the patrol car. (Aaron's Affid, p. 3;). Deputy Stancil turned around and began to remove the female passenger from the vehicle. (*Id*., p. 4).

While standing in front of the patrol car and its video camera, Dalton pulled out a gun from his pocket and fired at least two shots at Deputy Aaron. (Aaron's Affid., p. 4; Doc. No. 73, Pl's Response, p. 10; Def's Ex. 4, DVD). One shot hit Deputy Aaron's ballistic vest. (Aaron's Affid., p. 4). Deputy Stancil turned around and repeatedly discharged his weapon

at Dalton.[2]  (*Id*.; Doc. No. 73, Pl's Resp., p. 10).  Dalton dropped the gun and stooped down between his vehicle and the patrol car.  (Doc. No. 24, Stancil's Affid., p. 4.)  When Deputy Stancil heard air coming out of a tire and no other gunshots coming from Dalton's direction, he looked around his patrol car and observed Dalton kneeling on the ground and lying chest forward into his own vehicle with the gun on the ground. (*Id*.)  When two additional deputies arrived on the scene, Stancil shouted to them, "He's got a gun."  (Doc. No. 73, Pl's Resp., p. 12).  Deputy Allen picked the gun off the ground.  (*Id*.)

Dalton was transported to a hospital in Columbus, Georgia, and received medical treatment for a collapsed lung and other injuries.  (*Id*.)  On January 20, 2009, Dalton pled guilty to two counts of Attempted Murder, one count of Unlawful Breaking and Entering, and one count of Theft of Property in the Third Degree.  The Lee County Circuit Court sentenced Dalton to thirty years of imprisonment on each charge of Attempted Murder, five years of imprisonment for Unlawful Breaking and Entering, and one year of imprisonment for Theft of Property.  (Def's Ex. 1).

### B.    Official Capacity Claims and Eleventh Amendment Immunity

To the extent Dalton sues each of the defendants in their official capacity, the defendants argue they are immune from suit in their official capacities pursuant to the

---

[2] Dalton alleges that Deputy Stancil fired his weapon eleven times and that he received six bullet wounds.  (Doc. No. 73, Pl's Resp., p. 11).  Deputy Stancil alleges that Dalton pointed his pistol at him and Deputy Aaron and fired his weapon four times, striking Deputy Aaron once.  (Doc. No. 24, Stancil's Affid, p. 4.) Dalton, however, alleges that he fired his weapon only twice at Deputy Aaron and then dropped the gun. (Doc. No. 73, Pl's Resp., p. 10.)

Eleventh Amendment.[3]  Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Under all facets of Alabama law, a county sheriff and his staff act as state officers "when supervising inmates and otherwise operating the county jails." *Turquitt v. Jefferson County*, 137 F.3d 1285, 1289 (11th Cir. 1998); *see* Ala. Const. Art. V, § 112 (designates county sheriff as member of State's executive department); *see also Parker v. Amerson*, 519 So. 2d 442 (Ala. 1987) (county sheriff is executive officer of the State).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, [59], 116 S. Ct. 1114, 1125, 134 L. Ed. 2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997); *see also Powell v. Barrett*, 496 F.3d 1288, 1304, 1308 (11th Cir. 2007) (state defendants sued in their official capacity for monetary damages are immune from suit under the Eleventh Amendment).

　　　In light of the foregoing, it is clear that the defendants are state officials entitled to

---

[3]Eleventh Amendment immunity does not foreclose suits for injunctive and/or declaratory relief; rather, if applicable, it forecloses suits for compensable damage awards.

sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994). Thus, the defendants are entitled to absolute immunity from any claims for monetary relief presented against them in their official capacities. *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### C.    Qualified Immunity and Excessive Force

Dalton seeks damages from the defendants pursuant to 42 U.S.C. § 1983 claiming that during his arrest on August 27, 2008, they used excessive force against him in violation of his constitutional rights. The defendants contend that they are entitled to qualified immunity because their use of deadly force was reasonable under the circumstances.

Under the well-defined qualified immunity framework, a "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). There is no genuine dispute that the defendant officers were acting in their discretionary capacity in this case; thus, the burden shifts to Dalton to show that qualified immunity is inappropriate. *Id.* To do so, the plaintiff must meet the two-part standard established by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223 (2009). First, the plaintiff must allege facts that establish that the officers violated his constitutional rights; and second, the plaintiff must also show that the right involved was "clearly established" at the time of the putative misconduct. *See id.* at 232. This inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition."

11

*Lee*, 284 F.3d at 1194. In *Pearson*, the Supreme Court concluded that a court may assess these factors in any order.  555 U.S. at 236.  In this case, the plaintiff fails to establish the first prong.

Where, as here, a plaintiff claims that a law enforcement officer has used excessive force in the course of arresting or otherwise seizing him, the court analyzes his claim under the Fourth Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  In deciding whether a law enforcement officer used excessive force, the court must pay "careful attention to the facts and circumstances" of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396 (citing *Tennessee v. Garner,* 471 U.S. 1, 8- 9 (1985)).

In the deadly force context, a law enforcement officer may constitutionally use deadly force when the officer

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible.

*McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).  But, these useful factors must not be applied mechanically, *see Penley v. Eslinger,* 605 F.3d 843, 849-50 (11th Cir. 2010), and the court "must still slosh  . . . [its] way through the fact bound morass of 'reasonableness,'" *Scott v. Harris,* 550 U.S. 372, 383 (2007).

Even so, consideration of the factors is helpful in determining the reasonableness of the defendants' conduct. The first factor is whether the officers had probable cause to believe that Dalton posed a threat of serious physical harm, either to the officers or to others or whether he committed a crime involving the infliction or threatened infliction of serious physical harm. Dalton shot a law enforcement officer; about that there is no dispute. Thus, the defendants had ample probable cause to believe Dalton posed a threat of serious physical harm to the defendants and to others. The second factor asks whether the defendants reasonably believed that the use of deadly force was necessary to prevent escape. The video evidence clearly shows that Dalton took his pistol out of his pocket and began shooting at Deputy Aaron while handcuffed. Under these circumstances, the court has no hesitancy in concluding that the officers reasonably believed that not only was the use of deadly force reasonable to prevent escape but that it was also reasonably necessary to prevent harm to the officers and others. Finally, the last factor asks whether it was feasible to give some warning about the possible use of deadly force. The video evidence indicates that Dalton was standing in close proximity to Deputy Aaron when he pointed a pistol at him and began shooting. There was no time to spare. The fact that Deputy Stancil did not caution Dalton that he was going to return fire or that he continued to fire his weapon after Dalton dropped his gun and hid behind a car door does not create a dispute sufficient to render summary judgment improper. What Dalton did after firing two shots at an officer is immaterial to whether the officers reasonably perceived their lives or the lives of others to be in danger at that time. There is no dispute about this fact: Dalton shot a Reserve Deputy Sheriff at close

13

range.  Therefore, no further warning was reasonably feasible or necessary.

Under the circumstances of this case, the court concludes that the defendants' use of deadly force was objectively reasonable based on the fact that he posed an immediate, serious threat to the deputies and others caused by his reckless actions, and the fact that he was actively fleeing from arrest by his own use of deadly force.  In short, the defendants' use of deadly force was objectively reasonable and did not violate Dalton's Fourth Amendment rights.[4]  Thus, the defendants are entitled to qualified immunity, and Dalton is entitled to no relief.

**D.     Unlawful Arrest**

Dalton's remaining claims are that the defendants subjected him to an "unreasonable search and seizure to include [the] failure to announce authority [and] pretextual arrest." (Doc. No. 1, Pl's Comp., p. 2).  The crux of Dalton's argument is that the defendants violated his constitutional rights when they initially arrested him without a warrant or probable cause.

"An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim, but the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest.  *Case v. Eslinger,* 555 F.3d 1317, 1326–27 (11th Cir. 2009); *Kingsland v. City of Miami,* 382 F.3d 1220, 1226, 1232 (11th Cir.2004); *Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir.1996).  Probable cause

---

[4] To the extent Dalton argues the defendants violated his constitutional right to be free from excessive force during the initial stop and while being handcuffed, the court likewise concludes that he fails to demonstrate a genuine dispute of material fact and that the defendants are entitled to qualified immunity with respect to this claim.

exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed. *Madiwale v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir.1997)." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010). Probable cause to arrest exists when an arrest is "objectively reasonable based on the totality of the circumstances.....  This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.... Although probable cause requires more than suspicion, it does not require convincing proof ... and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction." *Lee v. Ferraro,* 284 F.3d 1188, 1195 (11th Cir.2002) (internal quotation marks and citations omitted). "The [arresting officer] may conduct a lawful search incident to arrest by searching the [arrestee and] the area within the immediate control of the arrestee, into which he might be able to reach for a weapon or evidentiary items." *United States v. Ochoa*, 402 Fed.Appx. 478, 483 (11th Cir.  2010).

In this case, the defendants had probable cause to arrest Dalton for theft of property. The undisputed facts demonstrate that Dalton was arrested after the deputies saw him in a vehicle matching the description of a vehicle involved in the burglary of vehicles and houses in the Smith Station area.  In addition, the video evidence clearly shows that Dalton's vehicle was pulled over in front of a subdivision entrance with its lights off outside a neighborhood

around 1:30 a.m. in the morning and that Dalton and one of the passengers were wearing black or dark clothing.   Thus, the individuals in the vehicle also fit the description of the burglars. Deputy Stancil also observed Dalton drop something onto the floorboard of the vehicle. The arresting officers had reasonably trustworthy information that would cause a prudent person to believe that Dalton had committed a crime.   Therefore, the defendants had probable cause to arrest Dalton for theft of property.[5]   In addition, Dalton's actions in firing a pistol at Deputy Aaron while in custody provided probable cause to arrest Dalton for attempted murder.   Thus summary judgment is due to be granted in favor of the defendants on the unlawful arrest claims. *Case*, 555 F.3d at 1326-1327 (citations and quotations omitted) ("The existence of probable cause at the time of arrest ... constitutes an absolute bar to a section 1983 action for false arrest.").   The defendants are therefore entitled to qualified immunity with respect to these claims.

**CONCLUSION**

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendants' motions for summary judgment be granted and that this case be dismissed with prejudice.   It is further

ORDERED that the parties shall file any objections to this Recommendation **on or before March 10, 2014**.   A party must specifically identify the findings in the

---

[5]To the extent Dalton attempts to justify his actions by asserting the defendants failed to announce their authority, his contention is without merit.   The video of the incident shows that the deputies were wearing Lee County Deputy Sheriff uniforms which clearly identified them as law enforcement officers.   In addition, there were street lamps near the entrance to the neighborhood and the officers parked next to Dalton's vehicle in a patrol car with its headlights engaged.   Under these circumstances, the authority of the defendants was readily apparent.

Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done this 21st day of February, 2014.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE